SHANNON, Judge.
Appellant was tried on an information charging her with murder in the second degree. She was found guilty by the jury and sentenced to a term of 25 years in the state penitentiary. She has prosecuted this appeal from the judgment and sentence of the court below.
The defendant has posed two points of law; namely, (1) did the lower court commit error in refusing to allow the defendant to testify concerning a threat made to her by the deceased about one month prior to the homicide, which threat tended to show the defendant’s apprehension and fear at the time of the shooting, and (2) did the court commit error in refusing to *861 instruct the jury on self-defense when self-defense was the only defense offered?
The defendant, an 18 year old Negress, was the common-law wife of Willie Daniel Hope, the state’s main witness. On the night in question, the defendant went to an apartment house to visit her sister, who lived on the second floor. Access to the second floor apartments was by way of stairs to an outside porch or walkway that encircles the building. As the defendant was climbing the stairs, she heard her baby crying in one of the apartments and she immediately followed the sound to apartment number 16. Looking through the window, she saw Willie Daniel Hope and her baby sitting on a chair and deceased lying on her stomach on the bed, playing with deceased’s child.
The defendant’s testimony contradicted that of Willie Daniel Hope. She testified in part as follows:
"A. I said to him, I say ‘Bring me my baby’, and he didn’t say anything, and she was lying down, I didn’t see her and she got up out of the bed and she said to me, ‘He ain’t going to give you nothin’, and she say ‘the best thing you can do is to leave my door’, and I say to her, ‘Rosa, I’m not going any place until I get my baby’, and she said ‘We’ll see’, and so she reached down and got the hammer and started toward me and I backed away from the door and I fired two shots through the window.
“Q. Were you firing at any particular thing in that room? A. No, I was trying to scare her away from me because I was afraid because she had told me if she would ever catch me she was going to stomp my baby out of me.
“Mr. Sandstrom: Just a minute, I object to that and move to strike it on the ground it’s irrelevant and immaterial.
“Court: Objection sustained, motion granted. Gentlemen of the Jury, the statement ‘she said she was going to stomp the baby out of me’, disregard that, and strike it.
* * * * *
“A. Well when I got up to this apartment I yelled at my husband and told him to bring me my baby, and he didn’t say anything, she got up out of the bed and 'she said to me ‘He is not going to bring you anything’, and so-she said ‘the best thing you can do is to get away from my door’, and I said ‘Rosa I’m not going any place until I get my baby’, and she said tome, ‘We’ll see’, and she reached down and got the hammer, and started toward the door, and I got scared and I backed away from the door to the railing along the side, and I fired two-shots through the window, and I don’t know what happened after that.
“Q. When you fired the shots did you see her in the room? A. No, I didn’t.
“Q. What were you afraid of at the time you fired the shots? A. I was afraid of her, I was afraid if she got to me with that hammer she might hurt me.
“Q. How many months were you pregnant? A. I was nine months pregnant.”
Although the deceased was lying on the-floor in the vicinity of the door after the shots were fired through the window, no-hammer was found in the apartment. The defendant’s child was born six days after the shooting. Her testimony that about' a month before the shooting, deceased had: threatened to “stomp the baby out of her” was proffered to show defendant’s fear of deceased. While the lower court refused to charge the jury on self-defense and justifiable homicide, the prosecuting attorney argued self-defense in his rebuttal, argument.
In one of the earlier Florida cases which, has been an authority for many years, Gar *862 ner v. State, 28 Fla. 113, 9 So. 835, 840, our Supreme Court said:
“ * * * Except in the above instances, threats previously made by the deceased, whether communicated to the defendant or not, are not admissible unless there is testimony which at least tends to show that the deceased at the time of the killing had in fact or apparently sought a conflict with the accused, or was actually or apparently making some demonstration or overt act of attack towards the accomplishment or consummation of such threats. There must be, at least apparently, such a demonstration of an immediate intention to execute the threats as will naturally induce a reasonable belief that the party threatened will lose his life or suffer serious bodily harm if he does not immediately take the life of his adversary. It must be such an act as is reasonably calculated to induce the belief that the execution of the threatened attack has been actually commenced. Bond v. State [21 Fla. 738], and Myers v. State [62 Ala. 599], supra; Smith v. State, 25 Fla. 517, 6 So. 482; Evans v. State, 44 Miss. 762; Payne v. State, 60 Ala. 80; Campbell v. People, 16 Ill. 17; Irwin v. State, 43 Tex. 236; Pritchett v. State, 22 Ala. 39; Pond v. People, 8 Mich. 150. The circumstances of the killing must be such as tend to raise or support a case of self-defense. There must be, at least apparently, a hostile demonstration, or overt act of attack, tending to ■show that the accused was in such imminent danger.
“The question of the admissibility of threats is one for the court’s decision. If there is the slightest evidence tending to prove a hostile demonstration, which may be reasonably regarded as placing the accused apparently in imminent danger of losing his life or sustaining great bodily harm, the threats should not be excluded. *
Under an early statutory provision, similar to § 918.09, F.S., F.S.A., which provides that the accused may be sworn as a witness in his own behalf, the Supreme Court held in Hart v. State, 38 Fla. 39, 20 So. 805, 807, that:
“ * * * the testimony of the accused alone, when sufficient -in itself for that purpose, will authorize the admission of evidence of the violent and dangerous character of the deceased, and that this results from the character of his testimony under the statute, as being that of a witness in the case, and of his status, when testifying, as that of a witness in the cause before the court and jury.”
We are of the opinion that error was committed in refusing to permit the defendant to testify concerning the threat.
On the point as to whether the court committed error in refusing to instruct the jury on self-defense, our Supreme Court in the case of Barnes v. State, Fla. 1957, 93 So.2d 863, 864, stated the rule as follows:
“It is well settled that 'where the evidence is inconclusive or conflicting, the failure of the trial judge to provide a charge which lays down standards for the jury to follow under varying permissible views of the evidence constitutes reversible error.’ Holley v. Kelley, Fla.1957, 91 So.2d 862, 864, and cases cited. Nor is there any legal principle more firmly established in our system of jurisprudence than that which makes the jury the sole arbiter of the credibility of the witnesses (except where contrary to demonstrable physical facts) including the reasonableness, probability and credibility of the testimony of the defendant. Cf. Tidwell v. State, 143 Fla. 397, 196 So. 837.
“It is true that Wilsky testified that, after he told Barnes about the shots he had heard, Barnes said he was in a hurry to meet a man and would see about *863 them later. And the trial judge, in declining to give the charge requested by Barnes, must have thought that Barnes’ testimony as to his motives in returning to the area was, in all the circumstances, so improbable as to be unworthy of belief. But however improbable, it was not demonstrably false, and the trial judge invaded the province of the jury when he disregarded it.
“It was, then, error to refuse to give the charge requested by Barnes and it was clearly not harmless error.”
Regardless of how improbable the defendant’s testimony was, it certainly was not demonstrably false, and as our Supreme Court did in the Barnes case, we must hold that the trial court erred in refusing a self-defense instruction.
Reversed.
ALLEN, C. J., and KANNER, J., concur.