CONNER, J.
Jeffery E. Carter was charged with and convicted of two counts of aggravated battery. The State alleged he attacked two individuals using a knife. Carter appeals his conviction contending the trial court erred by (1) allowing a deputy to testily about two statements obtained from other witnesses; (2) giving the standard justifiable use of deadly force instruction at the State’s request over his objection; and (3) allowing improper rebuttal testimony. We affirm the trial court on giving the justifiable use of deadly force instruction, but reverse for a new trial after concluding the admission of improper hearsay testimony by the deputy and improper rebuttal evidence was harmful.

Factual Background

Carter, the two victims (J.W. and D.B.), and the eyewitnesses were all homeless persons living in tents in the woods. Both victims and the eyewitnesses corroborated each other’s testimony, describing Carter as an aggressive person. More than one testified that on the Thursday before the incident, Carter came to J.W.’s campsite after work looking for alcohol to drink. Everyone at the campsite had been drinking. When his requests for alcohol were declined and he was asked to leave, Carter refused and got into a scuffle with J.W. During the scuffle, J.W.’s earring was ripped out.
According to some of the witnesses, the next night, J.W. and D.B. were at S.W.’s campsite with S.W. and his girlfriend. The group had been drinking most of the day. Carter came to the campsite and an argument between Carter and J.W. ensued. There was another scuffle between the two during which Carter elbowed J.W. in the ribs, knocking him down. After knocking J.W. to the ground, Carter looked at D.B. and asked him if he had a problem. D.B. said he didn’t have a problem; then Carter pointed at D.B. and said, “I’ll be back to get you.” Carter left, and the group continued drinking. Sometime between midnight and 2:00 a.m., while the group was drinking and socializing around S.W.’s campsite, Carter walked up and punched J.W. Almost immediately after being punched, J.W. realized that Carter had a weapon in his hand. J.W. testified that just after he was punched, Carter hit D.B., the other victim, in the face. J.W. explained: “Blood spurted out, [D.B.] fell to the ground, [Carter] ran and I took my shirt off and applied it as a tourniquet to his face. Every time his heart would beat blood would pump out his face.”
D.B. testified that he saw Carter approaching with a knife and hit J.W. He then clarified that Carter “kind of bull rushed right around the side of the palm tree, hit [J.W.] in the chest, [and] slit him a little bit.” D.B. explained that without saying anything Carter immediately turned from J.W. to attack him. Carter then ran away.
*1034 Carter offered a self-defense version of the events. He explained that on the night of the attack all in the group were drinking excessively; he agreed that he got into a fight, but denied being armed with a knife. He testified that he, J.W., and S.W. (an eyewitness) made a bet on a football game on Thursday for five dollars each. Carter testified that when he went to collect his winnings, everybody started screaming and looking at him like he was crazy. He decided it was best to just leave and go back to his tent. Later that night he again tried to get the money he had won, but by this time at night J.W. was “wild.” Carter testified that J.W. was standing up and getting violent, so he became afraid and punched him with his bare hand. He acknowledged that he and J.W. had gotten in several “tussles” over the two years that they had known each other. Carter denied having a knife, but admitted that he punched J.W. in the chest. He further explained that he had noticed D.B. was in the motion of standing up to attack him, so he told D.B. to go ahead and stand up. He admitted that he punched D.B. to avoid being attacked by him, but again denied that he had a knife.
Testimony was presented that after the attack, deputies responded to the scene and took statements from the two victims and several eyewitnesses.

Improper Hearsay Evidence by a Deputy

During the testimony of one of the deputies responding to the scene, the following occurred:
[STATE:] Have you made any inquiry at this time as to who a potential suspect was?
[DEPUTY:] I asked [D.B.], you know, who did this to you, and he indicated a black—
[DEFENSE:] Objection, hearsay, Your Honor.
[STATE:] Your Honor, may we approach?
[COURT:] No, overruled. He’s here.
[DEPUTY:] He indicated a black man named Jeffrey Carter.
[[Image here]]
[DEPUTY:] I talked to [S.W. (an eyewitness) ]. As fire and rescue was taking [D.B.] away, [S.W.] stated that—
[DEFENSE:] I’m gonna object to hearsay, Your Honor.
[COURT:] [S.W.] was here, I’ll allow it.
[STATE:] You can go ahead, sir.
[DEPUTY:] [S.W.] indicated to me that Jeffrey Carter came into the camp, punched [J.W.] in the chest. He then looked at [D.B.], told him to stand up, indicated something to the effect of I’m here to kill and then slashed [D.B.] across the face and fled south into the wooded area.
(emphasis added.) Carter argues the court improperly denied his hearsay objections.
Whether an objection is erroneously overruled is reviewed by an abuse of discretion standard. Mitsubishi Motors Corp. v. Laliberte, 52 So.3d 31, 37 (Fla. 4th DCA 2010). However, the rules of evidence limit the trial court’s discretion. Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001).
“Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(l)(c), Fla. Stat. (2010) (internal quotation marks omitted). Hearsay is inadmissible except as provided by statute. § 90.802, Fla. Stat. (2010). In determining whether a prior out-of-court statement is hearsay, it does not matter that a person has testified as a witness during the trial. Carter v. State, 951 So.2d *1035 939, 944 (Fla. 4th DCA 2007) (“Hearsay includes an out-of-court statement of a witness who testifies at trial, as well as an out-of-court statement by someone who is not a witness on the stand testifying to the statement.”). If the State intended to use the prior statements of D.B. and S.W. to prove something other than the truth of what was asserted, the State did not make that known. The trial court’s comment to the effect that the witness had testified at trial did not make the prior statements non-hearsay, and the admission of the pri- or statements was error.
Citing Robertson v. State, 829 So.2d 901, 906 (Fla.2002), the State asks us to affirm the admission of the prior statements as the correct result even if the trial court asserted the wrong reasons because the prior statements can be admitted as prior consistent statements.
“Section 90.801(2)(b), [Florida Statutes (2010) ] provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and offered to rebut a charge of improper influence, motive, or recent fabrication.” Neal v. State, 792 So.2d 613, 614 (Fla. 4th DCA 2001) (citation omitted). However, “[t]he exception [allowing a prior consistent statement as non-hearsay] involving impeachment by bias or corruption or improper motive is only applicable where the prior consistent statement was made ‘prior to the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify.”’ Jackson v. State, 498 So.2d 906, 910 (Fla.1986) (quoting McElveen v. State, 415 So.2d 746, 748 (Fla. 1st DCA 1982)); Kellam v. Thomas, 287 So.2d 733 (Fla. 4th DCA 1974). Stated another way, a prior consistent statement is inadmissible under section 90.801(2)(b) if it is made after the witness’ motive to lie arose. Id.
At trial and on appeal, Carter argued that the motive for the victims and eyewitnesses to fabricate a story against him arose prior to the incident in which the victims were injured. Carter, as he contended in opening statements, testified that the victims and eyewitnesses did not like him prior to the incident, and the victims and eyewitnesses were part of a clique within the camp. There was no evidence presented about an incident occurring between the date D.B and S.W. made statements to the deputy and their testimony at trial which would support a claim of recent fabrication. Because the alleged motive to fabricate existed prior to the statements by witnesses to the investigating officer, the prior consistent statements were inadmissible.
Having reviewed the record, we determine the erroneous admission of prior consistent statements was not harmless error. This is particularly true because the deputy stated S.W. said something to the effect that Carter appeared with an intent to kill, which none of the other witnesses testified about. Also, we have specifically warned that a police officer testifying about prior consistent statements by a witness is not only hearsay, but also improper bolstering. Barnes v. State, 576 So.2d 439 (Fla. 4th DCA 1991). As we said in Barnes, “[w]hen a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave.” Id. at 440. Because the error was not harmless, reversal for a new trial is required.

Justifiable Use of Deadly Force Instruction

Carter requested a jury instruction on the justifiable use of non-deadly force, but objected to the State’s request for an in- *1036 struetion on the justifiable use of deadly force. Carter testified that he was not armed with a knife. He cites Williams v. State, 65 So.3d 1209 (Fla. 2d DCA 2011), for the proposition that the trial court should properly deny an instruction on the justifiable use of deadly force where the defendant denied using a knife during a fight and where the victim testified the defendant cut him with a knife. He also argues the State requested an instruction on the justifiable use of deadly force to create a straw man closing argument which was prohibited in Brown v. State, 524 So.2d 730 (Fla. 4th DCA 1988). Because the case is remanded for a new trial, we address Carter’s argument.
Williams is inapplicable to this case because it is factually distinguishable. In Williams, the defendant asked for instructions on both the justifiable use of deadly force and non-deadly force. The Second District held the trial court properly denied giving an instruction on the justifiable use of deadly force because the defendant testified he did not use a knife in the scuffle with the victim.[1] The logic of the holding is obvious: the defendant cannot testify that he did not use deadly force and then inconsistently ask for an instruction in support of that defense.
In this case, it was the State, rather than the defense, that asked for an instruction on the justifiable use of deadly force. The State asked for the instruction to avoid the jury being confused over an issue raised by the defense: the justifiable use of non-deadly force. This is not a case in which the party asking for an instruction was taking inconsistent positions. Instead, the State was trying to demonstrate the evidence did not support a defense of justifiable use of either deadly or non-deadly force.[2]
This is also not a case in which the holding in Brown applies. In Brovm, the State improperly raised a defense of alibi where the defendant offered neither evidence nor argument raising the defense. Brown, 524 at 731. In other words, the State improperly raised an issue of a “straw man defense” in order to easily knock it down. Moreover, in the process of raising the defense by innuendo, the State managed to impermissibly leave the impression that the defense had the burden to prove a defense it never raised. There is nothing factually similar to Brown in this case. It is Carter who raised the defense of self-defense. There are two species of self-defense: justifiable use of deadly force and justifiable use of non-deadly force. Where conflicting evidence supports both species, it is for the jury to decide if either species exists.
“If the type of force used is clearly deadly or non-deadly as a matter of law, only the applicable instruction should be given. Otherwise the question of whether the force used by a defendant was ‘deadly’ or ‘non-deadly’ should be submitted to the jury.” Williams v. State, 727 So.2d 1062, 1063 (Fla. 4th DCA 1999) (citations omit *1037 ted). “[0]nly the discharge of a firearm has been held to be deadly force as a matter of law.” Id. (citation omitted).
This case is factually more similar to the situation we addressed in Marshall v. State, 747 So.2d 1045 (Fla. 4th DCA 2000). There, the defendant was charged with aggravated assault with a firearm. Claiming self-defense at trial, the defendant withdrew his request for an instruction on the justifiable use of deadly force after the trial court granted the State’s request to give an instruction on the justifiable use of non-deadly force. The trial court refused the defense request to withdraw the instruction on justifiable use of deadly force since there was evidence of use of a firearm.[3] After the defendant was convicted of a lesser misdemeanor charge, he appealed contending it was error to give an instruction on the justifiable use of deadly force over his objection. We held:
Because it is for the jury to determine whether the force involved was deadly or non-deadly, we affirm the trial court’s determination to give both charges. See Garramone v. State, 636 So.2d 869, 871 (Fla. 4th DCA 1994); Cooper v. State, 573 So.2d 74, 76 (Fla. 4th DCA 1990). Moreover, “[t]he state, like the defendant, is entitled to all applicable jury instructions” supporting its theory of the case. Diggs v. State, 489 So.2d 1228, 1228 (Fla. 5th DCA 1986).
Id. at 1045-46.
We find no error in the trial court instructing the jury on the justifiable use of deadly force.

Improper Rebuttal Evidence

During cross-examination, Carter stated that the testimony of the State’s witnesses at trial was inconsistent with written statements the witnesses gave to law enforcement shortly after the incident. The thrust of his comments was that the witnesses had gotten together and talked sometime after the incident and that is why their testimony was consistent at trial. The State then asked Carter if he recalled the testimony of one of the deputies that he took recorded oral statements from the witnesses at the scene. Carter stated he doubted the statements were recorded because he never saw a transcript of those statements. The State acknowledged the oral recorded statements had not been transcribed, but then asked Carter “you would agree that if they all gave statements that night that were consistent, they did not have time to create that because the police were called immediately?” Carter responded, “Oh, I would agree with you, if you say it in that matter, ma’am, I have to agree with you that way because it makes sense.”
Over Carter’s objection, the State called the deputy who took the recorded oral statements as a rebuttal witness. The deputy confirmed he took recorded statements from five witnesses, including J.W. and S.W. The State then asked, ‘Were their versions of what happened consistent with each other?” The deputy responded, “For the most part. And what I did was I separated everybody so as soon as I would interview — it would be together but I’d take the person and move them over, interview them and then I’d take the next person and remove them and move them over and by myself with them, so it wasn’t like they were together.”
We agree with Carter that the rebuttal testimony was improper for two reasons. First, Carter never affirmatively denied that recorded oral statements were taken that night. He merely doubted the *1038 statements were recorded because he never saw a transcript of them. Second, the deputy’s testimony constituted improper bolstering. If the State was seeking to rebut Carter’s charge that the written statements by the witnesses differed from their testimony before the jury, it is the written statements which should have been introduced, not the officer’s opinion that the witnesses gave consistent oral statements on the night of the incident. Moreover, if the recorded oral statements on the night of the incident were the crux of the rebuttal, the recorded oral statements should have been introduced, not a witness’s opinion about their consistency.
The rebuttal testimony was improper and harmful as improper bolstering, requiring reversal.

Conclusion

We affirm the trial court on giving an instruction on justifiable use of deadly force, but reverse the trial court for allowing improper and harmful hearsay testimony regarding witnesses’ statements made at the scene and improper, harmful rebuttal testimony. A new trial is required.

Reversed and remanded for a new trial.

GROSS and CIKLIN, JJ., concur.

. In support of its holding regarding the deadly force instruction, the Second District cited earlier cases holding that the defendant cannot properly ask for a justifiable use of deadly force instruction after denying using a knife where the State's evidence shows the victim was cut with a knife by the defendant.

. Carter asked for the inclusion of the portion of the justifiable use of non-deadly force dealing with duty to retreat. The trial court instructed the jury, "If the defendant was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony.” (emphasis added.)

. Apparently the firearm was not discharged and deadly force did not apply as a matter of law. Williams v. State, 727 So.2d 1062, 1063 (Fla. 4th DCA 1999).